Filed 5/8/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDDIE LOPEZ MONTANEZ,<br><br>    Defendant and Appellant. | D079296<br><br><br>(Super. Ct. No. SCD204723) |

APPEAL from an order of the Superior Court of San Diego County, Jay M. Bloom, Judge. Affirmed.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Lynne G. McGinnis and Arlene A. Sevidal, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

Delores Attig was murdered in a secluded area of Balboa Park in 1986. She was with two male friends smoking and talking in their car when they

were attacked by four male assailants, two of them armed with guns. The assailants bound her friends and robbed them. Delores was led a short distance away, where she was gang raped and then shot once in the head at close range. Her murder remained a cold case for more than 20 years, until DNA analysis of evidence collected from her body led to the arrest of four men in 2007: Eddie Montanez, his brother Steve Montanez,[1] and two juveniles.

In 2010, a jury convicted Eddie of the first degree felony murder of Delores (Pen. Code,[2] § 187, subd. (a)), and found true a principal personally used a firearm (§ 12022, subd. (a)).[3] The jury rejected special circumstance allegations that Eddie aided and abetted the murder while engaged in the commission and attempted commission of robbery, rape, sodomy, and oral copulation (§ 190.2, subd. (a)(17)). He was sentenced to an indeterminate term of 25 years to life in prison, plus an additional year for the firearm

---

[1] We refer to the brothers by their first names to avoid confusion.

[2] Further unspecified statutory references are to the Penal Code.

[3] "Under the felony-murder doctrine as it existed at the time of [Eddie's] trial, 'when the defendant or an accomplice kill[ed] someone during the commission, or attempted commission, of an inherently dangerous felony,' the defendant could be found guilty of the crime of murder, without any showing of 'an intent to kill, or even implied malice, but merely an intent to commit the underlying felony.' " (*People v. Strong* (2022) 13 Cal.5th 698, 704 (*Strong*).) As such, Eddie's jury was given an instruction on first degree felony murder that provided: "If a human being is killed by any one of several persons engaged in the perpetration of . . . the crime of [rape/robbery], all persons . . . who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of . . . facilitating the commission of the offense aid, promote, encourage or instigate by act or advice its commission, are guilty of murder of the first degree, *whether the killing is intentional, unintentional, or accidental*." (Italics added.)

2

enhancement. In 2012, this court affirmed the judgment. (*People v. Montanez, et al.* (Nov. 14, 2012, D058128) [nonpub. opn.].)[4]

In 2018, Eddie petitioned to vacate his murder conviction pursuant to section 1172.6,[5] a procedural provision enacted to allow certain defendants to take advantage of a legislative amendment that restricted the scope of our state's felony murder law. The superior court denied Eddie's petition after an evidentiary hearing, in 2021. The court found the prosecution established beyond a reasonable doubt that Eddie was a major participant in the underlying robbery and sex crimes who acted with reckless indifference to human life, and thus Eddie remained liable for first degree felony murder under the new law. On appeal, Eddie contends there is insufficient evidence to support the superior court's findings he was a major participant in the felonies underlying Delores's murder who acted with reckless indifference to human life. We affirm the order.

---

[4] Steve was jointly tried with Eddie before a separate jury. Steve's jury found him guilty of the first degree murder of Delores and returned true findings on the firearm enhancement allegation as well as the special circumstance allegations based on robbery, rape, and oral copulation. Steve was sentenced to life in prison without the possibility of parole plus one year. We affirmed the judgment as to Steve in *People v. Montanez, supra,* D058128.

[5] The relevant procedural provision was originally codified as section 1170.95 but was later amended and renumbered as section 1172.6. (Stats. 2021, ch. 551, § 1, subd. (b) [amended]; Stats. 2022, ch. 58, § 10 [renumbered].)

3

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *Eddie's Petition*

In his petition to vacate his murder conviction and to be resentenced, Eddie asserted he could not be convicted of murder under the new felony murder law because he was not the actual killer; he did not aid and abet the actual killer with the intent to kill; and he was not a major participant in the felonies underlying the murder who acted with reckless indifference to human life. The superior court found Eddie set forth a prima facie case for relief and issued an order to show cause why relief should not be granted.

An evidentiary hearing was held on the petition in 2021. The prosecution acknowledged that Eddie's jury had already determined, by virtue of its special circumstance findings, that he was not the actual killer and he did not intend to kill. It argued, however, that Eddie remained liable for felony murder because he was a major participant in the underlying felonies who acted with reckless indifference to human life.[6] In support of this position, the prosecution relied on the trial record, which contained the following evidence.

---

[6]     Consistent with the state of the law in June of 1986, when the crimes were committed, the jury was instructed that to find any of the alleged special circumstances true, the prosecution was required to prove that the defendant intended to kill a human being or intended to aid another in the killing of a human being. (See *People v. Bolden* (2002) 29 Cal.4th 515, 560 [explaining that between 1983 and 1987, § 190.2, subd. (a)(17), was construed by our high court "as requiring an intent to kill, whether the defendant was the actual killer or an accomplice"].) The jury was thus required to find proof of intent to kill, but not proof of reckless indifference to human life, to return a true finding on the special circumstance allegations.

*Trial Evidence*[7]

A.    *The Crime Scene*

In the early morning hours of June 19, 1986, a homicide team from the San Diego Police Department found Delores's lifeless body in a dirt lot near the 2600 block of Golf Course Drive in the Balboa Park area of San Diego. She was lying on her back with her legs spread open, and she was nude except for a jacket covering her face.  There was a bullet wound to her head. A pair of underwear, jeans, and a pink and blue ladies' shirt were lying in a pile five feet from her body.  Two tennis shoes, and a black bra with a broken clasp, were found nearby.

This area of the park was near a residential neighborhood known to law enforcement as an area where people sold drugs out of their homes.  The dirt lot itself was "secluded."  It was downhill from a paved parking lot off of Golf Course Drive.  A curving dirt path connected the parking lot up above with the dirt lot down below.  The surface of the dirt lot was flat but rough; it looked like an open field.  At the boundary of the dirt lot farthest away from Golf Course Drive, the terrain angled sharply downhill toward 26th Street.

A white, four-door Fiat was parked in the dirt lot 50 feet away from Delores's body.  Several items were on the ground near the passenger side of

---

7    On April 1, 2022, we granted Eddie's unopposed request for judicial notice of the record of conviction filed in *People v. Montanez*, *supra*, D058128. Our factual summary is derived from the record of conviction.  Because this appeal requires us to apply the substantial evidence standard of review, we state the facts in the light most favorable to the prosecution as the party that prevailed in the superior court.  (*People v. Zamudio* (2008) 43 Cal.4th 327, 342 (*Zamudio*).)

the Fiat, including a set of keys, a pair of gray shoes, a leather belt, and shoelaces.

The autopsy of Delores's body revealed she died from a single gunshot wound to the head. Faint soot around the entrance wound established she had been shot at close range. Delores had abrasions to her knees, shin, left forearm and flank, injuries consistent with a physical struggle or collapse at the scene, where the terrain was covered in rocks, pebbles, and dirt. She also had a laceration on the back of her shoulder that was likely caused by ground impact and movement.

B.    *Michael S.'s Testimony*

Shortly after midnight on June 19, 1986, Delores and her male friends Michael S. and Star L. drove to Balboa Park in Star's white Fiat.[8] Star parked his car, and Michael got out. Michael saw a floodlight and heard a police radio. When the police left, Michael returned to the car. The three friends then drove to a Circle K and purchased a 12-pack of beer.

Sometime between 12:40 a.m. and 3:30 a.m., Michael, Star, and Delores returned to the park. They drove down a path to a secluded dirt lot "[j]ust to have some privacy." They parked their car on the side of the lot farthest from Golf Course Drive. They drank beer, smoked cigarettes, talked, and listened to music on the car radio.

Star and Delores were sitting in the back seat with the rear passenger-side door open. This door faced east, toward the path the group had taken to get down to the dirt lot. Michael was sitting in the driver's seat with both the driver and front passenger doors shut. His driver-side window was down.

---

[8]    Michael was the only percipient witness to testify for the prosecution, as Star had passed away before the trial.

6

From his vantage point, Michael could see if someone was approaching from the east or from the embankment leading up to the parking lot.

Around 45 minutes after they arrived at the dirt lot, Michael, Star, and Delores were "attack[ed]." Michael testified that "four men" came up to the car.[9] The assailants "hit the front and the back door at the same time, came right up to [Michael] and put a gun to [his] head." Michael testified, "Somebody came up from behind me and put what felt like a gun to the back of my neck . . . and said, Don't move." As he offered this testimony, he pointed to an area below and behind his left ear. The object pressed against his head "was cold like steel, and it felt like the end of a barrel." Michael could not see the person who was holding the gun to his head, but the gunman's voice was a "Hispanic male voice."

Michael told an investigator he "observed people dragging Star . . . and [Delores] out of the back of the car at the same time that somebody put a gun to [his] head." In an earlier proceeding, Michael testified that as the first person put a gun to his head, "[t]hree others" came around the other side of the car and "pulled Star and [Delores] out of the way[.]"

The man pressing the gun barrel to Michael's head told him, "Don't move. Freeze. Put your hands on the wheel." After a few seconds, the gunman instructed Michael to "[l]ie down" and "[c]rawl out of the car." When the gunman finished speaking, the front passenger-side door was "opened almost immediately" for Michael. Based on how quickly the passenger door was opened, Michael believed it would not have been possible for the gunman to have opened it.

---

9       He agreed he has said the number of men was "exactly four," and that other times he had also said the number of men was "[a]t least three to five." At trial, he testified he "knew there was at least four."

As he crawled out of the passenger side of the car, Michael observed "a lot of activity" at the back of the car on the passenger side, in the area where Star and Delores were seated. There was "commotion, voices, [a] ruckus." Asked to describe the "activity" that was "going on back there," Michael testified he heard "[s]everal voices" in addition to those of Star and Delores. Out of the corner of his eye, for "a fraction of a second," Michael saw Star holding Delores in his arms, and "somebody holding Star with a gun up to his head." This was a "different" gunman from the gunman who held a gun to Michael's head.

As Michael crawled out of the car through the front passenger-side door, the first gunman walked around the front of the car and rejoined Michael. Michael continued to receive instructions: "I'm being told keep my head down, crawl forward, move forward. . . . [D]on't put your head up. I'll blow you away." Michael complied and crawled forward with his face down. Just then, someone took Michael by the back of his collar. He explained, "[S]omebody had my collar and a gun to the back of my head and said, 'Crawl forward.'" He was then dragged about five or six feet away from the car.

As Michael was being pulled out of the car, the "ruckus" continued near the back of the car. Once he was out of the car, Michael was put on the ground on his stomach with his face in the dirt. In this position, he could not see the assailants. But he heard three or four people talking, other than Star and Delores.

Once Michael was on the ground, Star was "[a]lmost immediately . . . thrown down next to [him]." Michael testified that the assailants "told us not to move or they would blow us away." The assailants expressed their willingness to kill, saying "they had previously killed three people."

8

Then, Michael heard Delores being led away behind him. He heard her whimper, "No. Please. No. Please." She was led to the front of the car toward the embankment that led uphill to the parking lot. After Delores was led away, Michael did not hear any noises coming from her again.

As Michael lay on the ground, the assailants took Michael's belt off of him and used it to bind his hands. Michael knew there was more than one assailant next to him and Star. One assailant held a gun to the back of Michael's head as another assailant rifled through Michael's pockets. The assailants threatened to blow Michael away. They took $15 and "a little bit of weed" from him.

Star had been bound, too, with his own shoelaces. At one point, Michael saw that Star was "struggling a little bit[,] trying to move, get comfortable." The assailants told Michael, "Tell your friend to stop struggling or we'll blow him away." Michael feared he and Star were going to be killed. Then he heard a single gunshot.

The gunshot came 25 minutes after he first felt the gun pressed to his head, and it was fired in the area where Delores had been taken. Michael felt "[t]otal fear." He started praying because he thought he was going to be killed. He did not try to get up because he "was bound and there were people behind [him]."

Fifteen minutes after the gunshot, Michael realized the assailants were gone because he did not hear anything else. Star was able to cut his way out of the shoelaces that bound him, using a pocketknife he had in his back pocket. Star then freed Michael from his bindings.

Michael and Star called out Delores's name. She did not respond. Both men thought she had been shot. They then scaled down the ravine toward 26th Street and ran home to Michael's apartment to summon the police. Star

9

called 911 at 3:45 a.m. and later took officers to the dirt lot, where Delores's dead body was discovered.

C.     *Four Hispanic Males Stop at a San Clemente Gas Station, Where Delores's Purse Was Discarded*

At approximately 4:00 a.m. on June 19, 1986, four Hispanic males in a "reddish, maroon-ish" car pulled into a Union 76 service station next to the Interstate 5 freeway in San Clemente. The service station's night manager was the only employee on duty.

The night manager saw the driver and front passenger get out of the car. The driver's face was "really banged up" and "looked like it had either road rash or scratches." The front passenger was around six feet tall, taller than the driver. (Eddie is six feet tall, five inches taller than his brother Steve.) The driver and front passenger both appeared to be in their 20s. Two younger males were sitting in the back seat. The car was not parked near the gas pumps. According to the night manager, "they weren't getting any gas at all." Rather, "[t]he driver looked like he was on a mission."

The driver and front passenger asked the night manager if the gas station had a restroom. The driver's tone of voice was "strong, abrupt, forceful." He seemed "aggressive." The passenger was not as aggressive as the driver. The two men did not appear to be angry with each other. And the passenger did not seem distraught or upset.

The night manager directed the men to restrooms that were around the corner of the building. The men went into the ladies' restroom. When the night manager pointed this out, the driver responded, " 'What? Do you think we're stupid? We can't read? . . . Fuck you.' " Then, the passenger said something to the driver in Spanish, and the driver appeared to calm down. Although the night manager went about his business, he "felt scared" and "threatened."

10

A little later, the driver asked the night manager how to get to Ontario, California. The night manager said he did not know because he was new to the area, but that the driver was welcome to buy a map from the gas station's map machine. The driver responded, "You're starting to piss me off." Again the passenger and driver started talking to each other in Spanish, and the passenger once again calmed the driver down. The night manager "still felt there was a possible confrontation," and he "felt like calling 911 at that point."

The men then moved their car to the side of the building where the restrooms were located. The night manager did not watch what the men were doing there because he was busy cleaning, sweeping, and taking out the trash. However, he did not empty the trash in the ladies' restroom before his shift ended.

The four Hispanic males were at the service station for a total of 20 to 30 minutes. During that time, they did not purchase gas nor did they buy a map. The night manager saw them leave the station and get on the Interstate 5 freeway heading north towards Los Angeles.

Five days later, on June 24, 1986, two detectives from the San Diego Police Department went to the gas station and retrieved a wallet from a different station manager. Delores's driver's license was in the wallet. After the manager told one of the detectives he had thrown a purse in the dumpster the previous day, the detective retrieved the purse from the dumpster. At trial, Michael confirmed it was the purse Delores was carrying the day she was murdered.

D.    *Cold Case DNA Hit*

During the 1986 autopsy of Delores's body, the medical examiner collected biological material from her vaginal, oral, and anal cavities.

Delores's murder remained unsolved until some 20 years later, when a criminalist reviewing cold cases performed DNA analysis of the swabs collected from her body.

The analysis showed at least three men contributed to sperm recovered from her vaginal and anal cavities, with Richard Archuleta being the predominant contributor.[10] At least two individuals' DNA was identified in the sperm fraction on the swab from Delores's oral cavity, with Steve being the predominant contributor. The criminalist also analyzed semen stains on Delores's blouse and jeans. This analysis revealed that at least three men contributed to the stains, including Steve, Archuleta, and Steve's stepson, E.C.[11] Eddie was excluded as a contributor of DNA to the samples analyzed.

A defense forensic serologist testified that Archuleta was the predominant source of semen found on the swab of Delores's vaginal cavity, the second most prevalent source was E.C., and the third most prevalent was

[10] Archuleta was 17 years old at the time of Delores's murder. In a separate trial, a jury convicted Archuleta of first degree murder (§ 187, subd. (a)) and found true an allegation a principal was armed with a firearm (§ 12022, subd. (a)). This court affirmed his conviction and sentence of 26 years to life on appeal. (*People v. Archuleta* (Oct. 17, 2011, D057609 [nonpub. opn.].)

[11] E.C. was 15 years old at the time of Delores's murder. His case was adjudicated before the juvenile court, which found true that he committed first degree murder (§ 187, subd. (a)), found the firearm allegation true (§ 12022, subd. (a)), and found true felony-murder special circumstances based on robbery, sodomy, rape, and oral copulation (§ 190.2, subd. (a)(17)).

Although Archuleta was a minor at the time of the crimes, we refer to him by his full name because he was "held to answer as an adult in criminal proceedings." (Cal. Style Manual (4th ed. 2000) § 5:10, pp. 180–181.) We refer to E.C. by his initials because his offenses were adjudicated in juvenile court, and to avoid the confusion that would result if we referred to him by his first name. (See *id.*, §§ 5:9, 5:10, pp. 180–181.)

Steve, followed by an unknown fourth individual. This most likely indicated that Archuleta was the last person to ejaculate in Delores's vagina, with E.C. preceding Archuleta, and Steve preceding E.C. The unknown male preceded Steve. It was not possible to determine how much time passed between one deposit of semen and the next. This expert also testified it is possible for an individual to have sexual contact and not leave sperm behind, and as a consequence not leave any DNA on the victim.

E. *Eddie's Testimony*

In April 2007, after interviewing Archuleta and E.C., law enforcement officers arrested Steve and Eddie in Indio and transported them to San Diego. Eddie was interviewed by law enforcement about the events of June 19, 1986, and he testified about them at trial.

In June of 1986, Eddie was 23 years old, four or five years younger than Steve. Archuleta was 17 years old, and E.C. was 15. At six feet tall, Eddie was five inches taller than Steve. All four of them spoke Spanish, and they sometimes talked to each other in English and Spanish interchangeably.

As young children, Eddie, Steve, and their other siblings lived with their father until their father brutally killed their stepmother in their presence. The brothers then went to live with their mother, and Steve took over the role of disciplinarian. Steve would beat "the hell" out of his siblings. Everything seemed to "tick [Steve] off," he would "[j]ust explode." Steve left home at the age of 15 or 16. Eddie did not see much of Steve after that because Steve was "usually in prison."

In early 1986, Eddie went to live with his mother and uncle in Coachella. He "hung out a lot" with E.C., Steve's stepson, who lived nearby with Steve's wife. Steve was in prison at the time.

13

Between February and April 1986, Steve was released from prison and returned to Coachella to live with his wife and E.C. Eddie and Steve's relationship at this time was not close "because of violence." Eddie knew Steve had a reputation for violence among his friends. Eddie also "saw some of the violence." For example, Eddie once witnessed Steve assault a man who was "sitting in [a] car and minding his own business" by "smack[ing]" him with a piece of two-by-four lumber.

On June 18, 1986, Eddie and E.C. were smoking marijuana and "cruising around" in E.C.'s red or maroon Honda. They went to a store so Eddie could purchase beer and then returned to E.C.'s house. E.C. went inside. When he emerged, he told Eddie that Steve wanted to go with them somewhere to get marijuana. Eddie, E.C., and Steve then "cruised around" Coachella for five or six hours looking for marijuana. They stopped at houses where Steve would get out of the car and talk with people before getting back in the car.

They drove to Archuleta's house, where they drank and smoked marijuana. Steve and E.C. asked Archuleta if he knew where they could get marijuana. Eddie was familiar with Archuleta because Eddie had accompanied E.C. to Archuleta's house before. Eddie held a gun at Archuleta's house on this or some earlier occasion when Archuleta "started basically showing off a gun to [them]." Archuleta and E.C. each had access to multiple guns.

Steve, Eddie, E.C., and Archuleta then left Archuleta's house together in E.C.'s car, with E.C. driving. They drove through Mecca to "some other little city," either Brawley or Calexico. It was dark outside when they arrived. Steve got out of the car at a house where people were standing outside. Steve got into an argument with a man, and the man "pulled out a

14

gun on [Steve]." When Steve got back in the car, he was "visibly upset." Steve said he "should have shot [the man's] ass." When he heard Steve say this, Eddie assumed Steve "had a gun on him."

Steve, Eddie, and the two juveniles left this house and continued traveling. At some point, E.C. and Steve switched seats, and Steve started driving. Eddie was riding in the back seat. He testified that he would fall asleep and wake back up.

The next thing Eddie remembered was being in a residential area. He felt the car stop, which woke him up. He noticed that Steve and Archuleta were gone. They were standing at the front door of a house talking with some people. After several minutes, they returned, and the car started moving again.

Eddie was "trying" to get back to sleep when the car stopped again, this time in a park area. Everyone got out of the car. Eddie walked "a little distance into some bushes" to relieve himself. When he got back to the car, the only person he saw was E.C. Eddie asked where Steve and Archuleta were. E.C. pointed "[i]n a direction" and said, "They took off walking that way."

Eddie testified he and E.C. remained at the car drinking beer, talking, and smoking marijuana for 15 or 20 minutes. When they noticed that Steve and Archuleta had not returned, Eddie and E.C. started walking in the direction where E.C. had seen them go. They came to a hill and started climbing downwards.

At the bottom of the hill was a flat area, "pretty much an open field." It was very dark. Eddie and E.C. "were calling for [Eddie's] brother, where were they at." Eddie heard Steve turn around and say, "Over here. Come over here."

15

When Eddie and E.C. caught up to Steve, Eddie saw that Steve was pointing a gun at two men and a woman. Eddie testified he "initially . . . thought it was probably a robbery or something" because he saw the victims holding their hands up. But then he thought Steve may have gotten into an argument with one of the victims. Eddie kept asking Steve, "What's going on?" Steve told him, " 'Nothing, . . . nothing.' "

Steve seemed "upset" and was "calling off orders." He ordered the male victims to get on the ground. Steve was standing about three feet away from the male victims, and Eddie was standing about seven feet away from them. Steve told Eddie and the two juveniles to "keep an eye on them guys." E.C. and Archuleta then "went over there to that area" and stood by the male victims. Eddie backed up a few feet and stood facing the male victims with his eyes open.

Steve told the female victim to come with him. Steve had the gun and was "waving it around." Steve led the female victim "a short distance away" from where Eddie was standing. Eddie heard the female victim saying something like, "Please. No. Don't."

At the same time, the male victims were saying, " 'Hey, you guys want anything, you can have it, if you want money or whatever.' " It was at this point that Eddie realized "it might be a robbery." Eddie stood behind the male victims "conversating" with them. Eddie told the male victims he "wasn't going to do nothing . . . not hurt them or do anything." While this was happening, E.C. and Archuleta were "by the two guys that were on the ground." Although Eddie was within earshot of the two juveniles, he did not recall hearing anyone say to the male victims, "You better not move, or we'll blow you away," or "We have already killed three people."

16

Eddie testified he did not see whether the male victims were tied up or not, because he was "looking at [his] brother." Eddie "could see that [Steve] was getting on top of [the female victim]." Eddie heard Steve tell the female victim, "Shut up. Don't scream." Eddie "got the sense of what they were doing." It appeared to Eddie that Steve was "on top of her, raping her."

Eddie testified that after Steve was "with the girl for a while," Steve turned around and "started wanting us to come over there, and, as [Steve] said, 'take our turn.'" At that point, one of the juveniles "went with the girl." Eddie continued: "[W]hen the second guy went over there with the girl, my brother came back over towards the area that we were at. And . . . one of the [male victims] were [*sic*] saying . . . , 'Hey, whatever you want here, you can have it. Just don't hurt us,' . . . [a]nd [Steve] struck one of the [male victims]."

Steve then told Eddie to take his "so-called turn" with the female victim.[12] Eddie told him: "No, . . . I'm cool. I don't want nothing to do with that. You guys go on and do what you are going to do." Steve responded, "Get your ass over here right now." Eddie said "no" again, but Steve was persistent. Steve still had a gun, although he never pointed the gun at Eddie. He also never threatened to shoot Eddie unless he raped the female victim. But Eddie complied with Steve's demands because he was scared of Steve and he wanted "to get [Steve] off [his] back."

---

[12] Eddie testified that after Steve struck the male victim, Steve was "standing up talking with someone else" who Eddie did not know. This person was not there when Eddie "first got there with the juveniles." He did not know where he came from. Eddie never mentioned this other person to the detectives who interviewed him.

Eddie believed he was the third member of his group to take a "turn." When he went over to the female victim, Steve was standing by her and pointing the gun at her. She was unclothed, at least from the waist down, and she was shorter than Eddie and "very thin." Steve told Eddie, "Hurry up. Get on top of her. Get on top of her. Do it." Eddie testified that he took down his pants but not his underwear. When Eddie lowered his pants, Steve walked 15 feet away, which was "a little bit farther" than "where the guys were at" but close enough that Eddie could see him. Eddie could see that Steve's back was turned toward Eddie and the female victim.

Eddie "got on top of" the female victim. She was on her back. He put his hands on either side of her body in a position that prevented her from being able to get out from under him. He told the victim he was sorry, and she asked him not to hurt her. Eddie was sure he felt the victim's breasts pressing against him, although he was not "concentrating on that." He remained on top of her for "a couple of minutes." He did not penetrate her or ejaculate. Nor did he help her put her clothes on or help her to escape. Eddie testified he "fake[d] it . . . with her so that [Steve] could get off [his] back." When Eddie finished, he got up and walked over "towards where they were at." The only time that Eddie left the male victims who were lying on the ground was when he was "fake raping" the female victim.

Eddie testified that after he got off the female victim, a fourth assailant also "got on top of [her] and attacked her." Eddie told detectives he stood 10 to 20 yards away from the female victim while this was happening. He was standing with Steve "between the girl and the men."

After the fourth assailant finished sexually assaulting the victim, Steve told Eddie and the juveniles to run back to the car. Steve stayed behind with the victims as Eddie, Archuleta, and E.C. took off running uphill. As they

were running, Eddie heard a gunshot. Eddie had been running for about two minutes, and was approximately 50 yards away from where he had left Steve, when he heard the gunshot. He was close enough to the victims' car that he could still hear music playing. After hearing the gunshot, Eddie continued running alongside Archuleta and E.C. for another 15 minutes before arriving back at the car.

Steve returned to the car "a little while" later. His face was scraped up. He said he had fallen in a hole. Somebody asked Steve, "What was that?," referring to the gunshot. Steve said he had shot the gun in the air to scare the victims. After the initial exchange about the gunshot, there was no further conversation "about that." Once Steve got in the car, the group left the park and drove home to Coachella. He testified that he did not recall his group stopping at a gas station on the way home.

Eddie also denied taking anything from the victims. He testified he did not recall seeing E.C., Archuleta, or Steve with the victims' money, marijuana, or purse. Eddie also denied raping or murdering the female victim. He testified that before he arrived at the dirt lot and saw Steve with the gun, he did not think there was going to be a robbery, rape, or murder.

Eddie claimed he did not know the female victim had been killed until his arrest in 2007. In the intervening years, he did not tell anyone about what happened at the dirt lot in June 1986.

In interviews with law enforcement, Eddie said he thought he may have handled "the gun" earlier that day. He did not mention dozing off or falling asleep in the car. He did not say he never had sex with Delores; he only stated that he "didn't know" if he penetrated Delores or ejaculated. He did not tell the detectives he left his underwear on.

19

On cross-examination, Eddie said for the first time that when Steve "took the girl away to the side," Eddie told the juveniles, "Let's go." He did not say this when his trial counsel questioned him on direct examination. Nor did Eddie ever say this when he was interviewed by detectives.

F.     *Michael's Testimony Regarding the Assailants' Statements*

Michael's testimony about the attack differed from Eddie's account in several, material respects.

According to Michael, there was no time during the attack when he, Star, or Delores were standing up with their hands raised in the air. At no time did Michael hear anyone yell, "Hey, where are you guys at?," or "Over here. Come over here."

At no time during the crimes did Michael hear anybody say, "What's going on? What's happening?," or a response of "Nothing. Nothing." He never heard anyone in the group of assailants ask, "What's going on?," or "What's up?," or "[W]hat are you doing?"

When Michael heard the assailants talking among themselves, he did not hear any voice that sounded surprised or shocked. Quite the opposite, the assailants sounded calm. He did not hear any voices sounding argumentative with each other. After Michael had been bound and his pockets had been emptied, he heard muffled words between at least two of the assailants, enough that he could hear their tone of voice. Michael did not detect any tone of surprise, shock, or argument.

At no time did Michael hear an assailant say to another, "[L]et's go. Let's go." Neither Michael, Star, nor Delores ever said, "Hey, look. You want money?" or offered to give the perpetrators money. Nor did they ever say, "[J]ust don't hurt us," "You could have it," or "Take what you want."

20

No one told Michael at any time, "I'm not going to hurt you." None of the assailants ever said to Michael, "I ain't going to do nothing to you guys." None of the assailants held any type of conversation with Michael, other than issuing threats and ordering him to do things.

During the course of the crimes, no one ever said, "No. I don't want to do that," or "I don't want that." Michael did not hear anyone say, "Nah. It's all right. You guys go on." Michael did not recall any of the assailants saying anything like, "I'm sorry."

## III.

### *The Superior Court's Ruling Denying Eddie's Petition*

At the conclusion of the evidentiary hearing, the superior court took the matter under submission. It later issued a written order finding the prosecution had established beyond a reasonable doubt that Eddie was a major participant in the underlying felonies and acted with reckless indifference to human life.

Explaining the basis for its ruling, the court stated that Eddie was part of a group that held three victims hostage, tied two of them, threatened to kill them, and robbed them while Steve threatened the victims with a gun.[13]

---

[13] The superior court, in summarizing the procedural history of the case, stated the jury found Eddie was armed with a firearm. This was incorrect. The jury was instructed the firearm allegation only required proof that *a principal* was armed with a firearm. Since the instruction was nonspecific, the verdict on the firearm allegation cannot be taken as a finding Eddie was the specific individual who was armed. In his opening brief on appeal, Eddie is critical of the court's mischaracterization of this finding. We agree with Eddie the court got this procedural fact wrong, but the court did not go on to rely on the purported finding when it analyzed the merits of the petition, so the inaccuracy does not appear to have affected the court's decision. Eddie criticizes other aspects of the court's order. He contends the court's findings about Eddie's part in the crimes were too generalized; the court assumed

Steve led the female victim away at gunpoint.  Steve sexually assaulted her, and then a second member of the group sexually assaulted her.  Eddie then sexually assaulted her, "but apparently did not actually rape her."  After a fourth member of the group sexually assaulted the female victim, Eddie and two of his cohorts "ran away leaving the female victim alone with [Eddie's] brother Steve."  Steve then shot and killed the female victim.  Eddie and his two cohorts fled without stopping to see if they could help or render aid.

The court found Eddie was an active participant in the criminal activity who "did not try to stop the criminal conduct, but actively aided in the threats and intimidation to the victims."  Eddie sexually assaulted the female victim after being "invited . . . to join in the gang rape," and helped dispose of evidence at the gas station later.  The court inferred the four Hispanic males who stopped at the gas station were Steve, Eddie, and the two juveniles, and that the driver was Steve, and the passenger was Eddie.  It found Eddie had "some control" over Steve, as evidenced when he calmed Steve down at the gas station, helping to "prevent another violent incident."  Even so, Eddie actively participated in the crimes and did not try to stop his brother during the attack.  There was no evidence Eddie tried to leave the group or report

---

Eddie learned about the murder after the fact, when there was no evidence to support this assumption; and the court held Eddie's failure to report the crimes against him and cited Eddie's failure to report Steve's other " 'violent acts' " as a reason for doubting Eddie's claim that he would have reported the murder if he had known about it.  To the extent these criticisms bear upon Eddie's substantial evidence challenge to the court's major participant and reckless indifference findings, we consider them when we analyze those issues.

the crimes, including the murder, which the court "assume[d]" Eddie learned about over the next 20 years.[14]

## DISCUSSION

### I.

*Principles of Law*

A.    *Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437)*

In 2017, the Legislature resolved to reform the state's homicide law " 'to more equitably sentence offenders in accordance with their involvement in the crime.' " (*Strong*, *supra*, 13 Cal.5th at p. 707.)  "The next year, the Legislature followed through with Senate Bill 1437, which made significant changes to the scope of murder liability for those who were neither the actual killers nor intended to kill anyone, including certain individuals formerly subject to punishment on a felony-murder theory." (*Ibid.*)

"As relevant here, Senate Bill 1437 significantly limited the scope of the felony-murder rule to effectuate the Legislature's declared intent 'to ensure that murder liability is not imposed on a person who is not the actual

---

[14]    In its order, the superior court correctly rejected Eddie's argument that the jury's return of not true findings on the special circumstance allegations conclusively established Eddie's entitlement to resentencing relief.  As we have noted, consistent with the state of the law in June 1986, the jury was required to find proof of intent to kill, but not proof of reckless indifference to human life, to return a true finding on the special circumstance allegations. (See fn. 6, *ante*.)  As a result, the jury's rejection of the special circumstance allegations could not be interpreted as a determination that Eddie did not act with reckless indifference to human life.  On appeal, Eddie appropriately has not reasserted this argument.  (See § 1172.6, subd. (d)(2); *Strong, supra,* 13 Cal.5th at pp. 708–709 [under § 1172.6, subd. (d)(2), "[i]f there has been 'a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner' "].)

23

killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citations.] Penal Code section 189, as amended, now limits liability under a felony-murder theory principally to 'actual killer[s]' (Pen. Code, § 189, subd. (e)(1)) and those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' (*id.*, subd. (e)(2)). Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of . . . [s]ection 190.2'—that is, the statute defining the felony-murder special circumstance. (*Id.*, § 189, subd. (e)(3).)" (*Strong, supra,* 13 Cal.5th at pp. 707–708.)

Senate Bill 1437 also established a procedure allowing eligible defendants convicted under the former felony-murder law to seek retroactive relief under the law as amended. "Under newly enacted section 1172.6, the process begins with the filing of a petition containing a declaration that all requirements for eligibility are met (*id.*, subd. (b)(1)(A)), including that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to . . . [s]ection 188 or 189 made effective January 1, 2019,' the effective date of Senate Bill 1437 (§ 1172.6, subd. (a)(3))." (*Strong, supra,* 13 Cal.5th at p. 708.) "After receiving a petition containing the required information, 'the court must evaluate the petition "to determine whether the petitioner has made a prima facie case for relief." ' " (*People v. Guiffreda* (2023) 87 Cal.App.5th 112, 122 (*Guiffreda*).)

If the defendant makes such a prima facie showing, the court must issue an order to show cause and "hold an evidentiary hearing at which the prosecution bears the burden of proving, 'beyond a reasonable doubt, that the

24

petitioner is guilty of murder or attempted murder' under state law as amended by Senate Bill 1437.  (§ 1172.6, subd. (d)(3).)"  (*Strong*, *supra*, 13 Cal.5th at p. 709.)  "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges."  (§ 1172.6, subd. (d)(3).)

The standard for holding a defendant liable for felony murder under new section 189, subdivision (e)(3), is the same as the standard for finding a special circumstance under section 190.2, subdivision (d).  (See *In re Taylor* (2019) 34 Cal.App.5th 543, 561; accord *Guiffreda*, *supra*, 87 Cal.App.5th at p. 123.)  As a result, we apply cases interpreting section 190.2, subdivision (d), including *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).  (See *Guiffreda*, at p. 123; *People v. Keel* (2022) 84 Cal.App.5th 546, 558, fn. 3.)

In *Banks*, our high court explained the phrases "major participant" and "reckless indifference" are derived from *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), in which the United States Supreme Court built on its earlier decision in *Enmund v. Florida* (1982) 458 U.S. 782 to examine the constitutional limits for imposing capital punishment on accomplices to felony murder.  (*Banks*, *supra*, 61 Cal.4th at pp. 800, 806.)  *Tison* and *Enmund* "collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions."  (*Banks*, at p. 794.)

The *Banks* court summarized the facts of *Enmund* as follows:  "Earl Enmund purchased a calf from victim Thomas Kersey and in the process learned Kersey was in the habit of carrying large sums of cash on his person.

25

A few weeks later, Enmund drove two armed confederates to Kersey's house and waited nearby while they entered. When Kersey's wife appeared with a gun, the confederates shot and killed both Kerseys. Enmund thereafter drove his confederates away from the scene and helped dispose of the murder weapons, which were never found. He was convicted of robbery and first degree murder and sentenced to death." (*Banks*, *supra*, 61 Cal.4th at p. 799.) As *Banks* explained, the United States Supreme Court reversed Enmund's death sentence, finding "a broad consensus against imposing death in cases 'where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder.' " (*Ibid*.)

At the other extreme were the facts of *Tison*, which the *Banks* court summarized as follows: "Prisoner Gary Tison's sons Ricky, Raymond, and Donald Tison conducted an armed breakout of Gary and his cellmate from prison, holding guards and visitors at gunpoint. During the subsequent escape, their car, already down to its spare tire, suffered another flat, so the five men agreed to flag down a passing motorist in order to steal a replacement car. Raymond waved down a family of four; the others then emerged from hiding and captured the family at gunpoint. Raymond and Donald drove the family into the desert in the Tisons' original car with the others following. Ricky and the cellmate removed the family's possessions from their car and transferred the Tison gang's possessions to it; Gary and his cellmate then killed all four family members. When the Tisons were later apprehended at a roadblock, Donald was killed and Gary escaped into the desert, only to die of exposure. [Citation.] Ricky and Raymond Tison and the cellmate were tried and sentenced to death. The trial court made findings that Ricky and Raymond's role in the series of crimes was ' "very

26

substantial" ' and they could have foreseen their actions would ' "create a grave risk of . . . death." ' " (*Banks*, *supra*, 61 Cal.4th at pp. 799–800.)

The United States Supreme Court, applying *Enmund*, affirmed Ricky and Raymond's death sentences. (*Banks*, *supra*, 61 Cal.4th at p. 800.) "*Tison* described the range of felony-murder participants as a spectrum. At one extreme were people like 'Enmund himself: the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' [Citation.] At the other extreme were actual killers and those who attempted or intended to kill. [Citation.] Under *Enmund*, *Tison* held, death was disproportional and impermissible for those at the former pole, but permissible for those at the latter. [Citation.] The Supreme Court then addressed the gray area in between, the proportionality of capital punishment for felony-murder participants who, like the two surviving Tison brothers, fell 'into neither of these neat categories.' [Citation.] Here, the court announced, 'major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement.' " (*Banks*, at p. 800.)

*Banks* explained that *Enmund* and *Tison* reflect the high court's "long-standing recognition that, in capital cases above all, punishment must accord with individual culpability." (*Banks, supra*, 61 Cal.4th at p. 801.) "With respect to the mental aspect of culpability," the relevant inquiry is whether the defendant " ' "knowingly engage[d] in criminal activities known to carry a grave risk of death." ' " (*Ibid.*) "With respect to conduct, . . . a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund." (*Id.* at p. 802.) Somewhere between the facts of *Enmund* and *Tison*, "at conduct less egregious than the Tisons' but more culpable than

27

Earl Enmund's, lies the constitutional minimum for death eligibility." (*Banks*, at p. 802.)

Explaining how the facts of *Enmund* and *Tison* materially differed, the *Banks* court stated: "The Tisons did not assist in a garden-variety armed robbery, where death might be possible but not probable, but were substantially involved in a course of conduct that could be found to entail a likelihood of death; distinguishing *Enmund*, the Supreme Court said: 'Far from merely sitting in a car away from the actual scene of the murders acting as the getaway driver to a robbery, each petitioner was actively involved in every element of the kidnaping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder of the Lyons family and the subsequent flight.' [Citation.] Unlike the Tisons, Earl Enmund *was* just a getaway driver, sitting in a car away from the murders. Execution of minor, absent participants like Enmund remained disproportionate and constitutionally intolerable." (*Banks*, *supra*, 61 Cal.4th at pp. 802–803.)

Comparing the facts of *Enmund* with the facts of *Tison*, the *Banks* court derived the following nonexclusive list of factors bearing on whether an aider and abettor of felony murder was a "major participant" under section 190.2, subdivision (d): "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was

28

used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*) To decide whether an accomplice is a major participant, the factfinder must consider the totality of the circumstances. (*Id.* at p. 802.)

Matthews, the accomplice whose punishment was at issue in *Banks*, was the getaway driver for an armed robbery of a medical marijuana dispensary. (*Banks*, *supra*, 61 Cal.4th at pp. 804–805.) After he dropped off his three confederates near the dispensary, he "waited three blocks away for approximately 45 minutes." (*Id.* at pp. 795, 805.) During this time, one of the robbers shot and killed the dispensary's security guard. (*Id.* at p. 795.) After the shooting, Matthews approached the dispensary in the getaway car, slowed to pick up the two non-shooters, and drove them away. (*Id.* at pp. 795–796, 805.)

The *Banks* court concluded these facts placed Matthews "at the *Enmund* pole of the *Tison-Enmund* spectrum." (*Banks*, *supra*, 61 Cal.4th at p. 805.) There was no evidence he had a role in planning the robbery or procuring weapons. Although Matthews and the two non-shooters were gang members, there was no evidence they had previously "committed murder, attempted murder, or any other violent crime." (*Ibid.*) During the robbery and murder, he "was absent from the scene, sitting in a car and waiting. There was no evidence he saw or heard the shooting, that he could have seen or heard the shooting, or that he had any immediate role in instigating it or could have prevented it." (*Ibid.*) In short, his conduct was "virtually indistinguishable from Earl Enmund's." (*Ibid.*) As a result, he could not be considered a major participant in the armed robbery. (*Id.* at p. 807.)

In *Clark*, our Supreme Court further elaborated on the element of "reckless indifference to human life," which it said " 'significantly overlap[s]' "

29

with the "major participant" element.  (*Clark*, *supra*, 63 Cal.4th at pp. 614–615.)  The *Clark* court explained that reckless indifference to human life has subjective and objective elements.  "The subjective element is the defendant's conscious disregard of risks known to him or her." (*Id.* at p. 617.)  " '[T]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' " (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)  " 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*Ibid.*)

The objective component is determined by considering what " 'a law-abiding person would observe in the actor's situation.' " (*Clark, supra,* 63 Cal.4th at p. 617.)  " ' "[T]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' " (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)  At the same time, "a defendant's good faith but unreasonable belief that he or she was not posing a risk to human life in pursuing the felony does not suffice to foreclose a determination of reckless indifference to human life under *Tison*." (*Clark*, at p. 622.)

Extrapolating from the facts of *Tison*, the *Clark* court derived the following nonexclusive list of factors bearing on whether a defendant acted with reckless indifference to human life:  the defendant's knowledge of weapons used in the crime, and their actual use and number; the defendant's physical presence at the scene of the murder and the events leading up to it,

30

and opportunity to act as a restraining influence on murderous cohorts or aid the victim; the duration of the felony; the defendant's knowledge of his cohort's likelihood of killing; and the defendant's efforts to minimize the risks of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623; see also *Scoggins*, *supra*, 9 Cal.5th at p. 677.) As with the *Banks* factors, " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, at p. 618.)

Applying these factors to the case before it, our high court determined Clark did not act with reckless indifference to human life. *Clark* involved the armed robbery of a computer store. Clark "was the mastermind who planned and organized the attempted robbery and who was orchestrating the events at the scene of the crime." (*Clark*, *supra*, 63 Cal.4th at p. 612.) During the robbery, which was planned to take place after the store closed, one of Clark's accomplices shot and killed the mother of a store employee who arrived at the store to pick up her son. (*Id.* at pp. 537, 620.) At the time of the shooting, Clark was not at the store, but he drove there shortly thereafter and fled after seeing the body of a woman lying on the ground, the police approaching, and the shooter fleeing the scene. (*Id.* at pp. 536–537, 619–620.)

Our high court, evaluating the evidence in light of the foregoing factors, found insufficient evidence to support the conclusion Clark acted with reckless indifference to human life. There was only one gun at the scene, and it was not carried by Clark. (*Clark*, *supra*, 63 Cal.4th at pp. 618–619.) Clark was absent from the scene of the killing, and the "ambiguous circumstances surrounding his hasty departure" made it "difficult to infer his frame of mind" concerning the victim's death. (*Id.* at p. 620.) Although the planned robbery was of substantial duration, it entailed handcuffing any employees in the bathroom while the robbers made away with the store's merchandise, so

31

the "period of interaction between perpetrators and victims was designed to be limited." (*Ibid.*) There was no evidence the shooter "was known to have a propensity for violence, let alone evidence indicating [Clark] was aware of such a propensity." (*Id.* at p. 621.) Because Clark was not present at the scene of the robbery, he had no opportunity to observe anything in the shooter's behavior that would have indicated the shooter was likely to engage in lethal violence. (*Ibid.*) Finally, there was evidence that Clark's plan for the robbery was designed to minimize the risk of violence: the robbery was to take place after closing time, and there were not supposed to be any bullets in the gun. (*Id.* at pp. 621–622.) Given Clark's apparent efforts to minimize violence and "the relative paucity of other evidence" supporting a finding of reckless indifference, the Court found the evidence before it insufficient to support a finding that he acted with reckless indifference to human life. (*Id.* at p. 623.)

B.   *Standard of Review*

Eddie contends there was insufficient evidence in the trial record to support the superior court's findings that he was a major participant in the felonies who acted with reckless indifference to human life. To determine whether sufficient evidence supported these findings, we apply the substantial evidence standard of review. (*Banks*, *supra*, 61 Cal.4th at p. 804; *Clark*, *supra*, 63 Cal.4th at p. 610.)

The principles of substantial evidence review are well-settled. "Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence—that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt." (*Banks*, *supra*, 61 Cal.4th at p. 804.) We must "review the whole record to determine whether *any* rational

32

trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt.  [Citation.] . . .  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence.  [Citation.]  'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' "  (*Zamudio, supra,*  43 Cal.4th at p. 357.)

"The same standard governs in cases where the prosecution relies primarily on circumstantial evidence."  (*Zamudio*, *supra*, 43 Cal.4th at p. 357.)  We must "presume, in support of the judgment, the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial."  (*Clark*, *supra*, 63 Cal.4th at p. 610.)  And " 'unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' "  (*People v. Ghobrial* (2018) 5 Cal.5th 250, 281.)  " ' "We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." ' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)  " 'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " ' " the factfinder's decision.  (*Ibid.*)

II.

*Substantial Evidence Supports the Superior Court's Finding That*
*Eddie Was a Major Participant in the Underlying Felonies*

Considering the trial evidence in the light most favorable to the prosecution, we conclude substantial evidence in the record supports the superior court's finding that Eddie was a major participant in the felonies that culminated in Delores's murder.

We agree with Eddie that although the crimes involved the use of two firearms, there was no evidence they were supplied or used by him, and there was also no evidence what role he played, if any, in planning the crimes. At the same time, however, no one *Banks* factor is necessarily dispositive (*Banks*, *supra*, 61 Cal.4th at p. 803), and the evaluation of a felony-murder aider and abettor's culpability requires a "fact-intensive, individualized inquiry" (*Scoggins*, *supra*, 9 Cal.5th at p. 683). As we discuss, the particular facts of this case support the conclusion that Eddie's degree of culpability fell on the *Tison* end of the *Enmund-Tison* spectrum.

The third *Banks* factor, the defendant's "awareness . . . of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants" (*Banks*, *supra*, 61 Cal.4th at p. 803), weighs heavily against Eddie. Starting with the nature of the crimes, this was no "garden-variety" armed robbery. (See *Banks*, at p. 802; *Clark*, *supra*, 63 Cal.4th at p. 617, fn. 74.) Here a group of four assailants, including two gunmen, captured three unsuspecting victims at gunpoint; forced two of them to the ground, bound them, robbed them, and detained them for 25 minutes as the third victim was stripped nude, isolated from her companions, and forced to commit sex acts with each of the four assailants. There were explicit and implicit threats to kill each of the victims. This all transpired in

34

the early morning hours after midnight, in a dark, secluded location where a killing was less likely to be immediately detected. The degree of danger posed to the victims was comparable to *Tison*, in which the family of four was robbed, captured, and taken to a remote location where they were guarded at gunpoint and then executed. (See *Tison*, *supra*, 481 U.S. at pp. 139–141; *Banks*, *supra*, 61 Cal.4th at pp. 799–800.)

Eddie contends there was insufficient evidence to support a finding that he was aware of any particularly heightened risk of death relative to an ordinary felony. We disagree. By his own admission, Eddie was keenly aware one of the gunmen, Steve, was both explosively violent and capable of committing sudden acts of violence against vulnerable victims. Eddie knew Steve had a reputation for violence among his friends and that Steve had been involved in violent offenses in prison. He personally experienced Steve's violence, having been the victim of Steve's beatings as a child and having witnessed Steve "smack[ ]" an unsuspecting victim with a piece of two-by-four lumber. (See *In re Harper* (2022) 76 Cal.App.5th 450, 461 (*Harper*) [petitioner "had personal experience with Brown's violent tendencies, having been the victim of Brown's beatings"].) Eddie was aware by virtue of his "past experience" of the "conduct of the other participants" (*Banks*, *supra*, 61 Cal.4th at p. 803) that committing an armed crime with Steve was a venture that posed a grave risk to the welfare of the victims.

Eddie concedes that "unquestionably" Steve was "known to be violent," but he insists that Steve "was not known to be a killer." We disagree that Eddie needed proof Steve was a known killer in order to assess that Steve was capable of using lethal force. (See *Harper*, *supra*, 76 Cal.App.5th at p. 462 [" '[f]rom the fact that [the cohort] had a shotgun—as well as from defendant's knowledge of [his cohort's] violent tendencies—defendant did not

need great insight or experience to conclude that the victim would be killed' "].)  Indeed the evidence at trial showed Eddie did not require Steve to have committed a prior murder to conclude that Steve was capable of using lethal force.  When Steve said he "should have shot [that man's] ass" after arguing with the stranger in Brawley or Calexico, Eddie so thoroughly accepted that Steve was capable of shooting someone that he assumed from Steve's statement that Steve was carrying a gun the day of their crimes.  (See *In re Loza* (2017) 10 Cal.App.5th 38, 50 (*Loza*) [even if accomplice believed shooter was joking when, before the armed robbery, the shooter said he had shot someone in the head, the shooter's statement "at the very least revealed that [the defendant] with eyes wide open embarked upon an armed robbery with the type of cohort who callously bragged about having shot another human being moments earlier"].)

The warning signs that the crimes posed a serious risk of danger to the victims accumulated as the crimes unfolded over the course of the approximately 23 minutes Eddie was present at the scene.  (Twenty-three minutes is the result one gets after subtracting the "couple of" minutes Eddie testified he was running before he heard the gunshot from the 25 minutes that Michael estimated elapsed between the initial assault and the gunshot.)  During the course of the crimes, Steve threatened to shoot the victims; Eddie, who was present at the scene, inferably knew this.  Eddie admitted seeing Steve point his gun directly at Delores, which was an implicit threat to shoot her.  Michael testified the assailants threatened to "blow" the victims away and said "they had previously killed three people."  Although Michael could not specify who made these statements, he used the plural, "they," when referring to the speakers.  Since the threats were threats to shoot, it is reasonable to infer the speakers were the assailants with guns.  Although

36

Eddie testified he did not recall hearing these threats, he also testified that he stood near the male victims at all times except for when he sexually assaulted Delores. Eddie's proximity to the male victims supports the inference he heard the threats.

The trial evidence supports the further conclusion that Steve's demeanor during the crimes served as a yet another warning sign that Eddie was uniquely capable of interpreting. Eddie testified Steve appeared "upset" when brandishing his weapon at the victims. He further testified that when Steve was "upset," Steve would "respond in a certain way"; Steve would "[j]ust explode." Indeed, according to Eddie, Steve had been "upset" earlier that very day when he said he should have shot the man in Brawley or Calexico. One can reasonably infer that Eddie, who was present at the scene and was acutely aware of Steve's behavioral patterns, was in a position to discern from Steve's demeanor that an increased likelihood of violence existed.

Eddie's presence at the crime scene afforded him the opportunity to observe additional facts showing the crimes posed a serious risk of danger to Delores. Eddie testified Delores was on her back throughout the sexual assaults. Eddie also knew the male victims were lying on their stomachs, and he believed the male victims saw the assailants for only a "couple of seconds." A reasonable observer could discern from these facts that out of the victims, Delores was in the best position to see the assailants' faces and later identify them, giving Steve, whom Eddie knew had recently been released from prison, a motive to kill her to avoid detection for the crimes.[15] (See,

---

[15] Eddie argues that since Delores's face was covered with a jacket when her body was discovered, her face may also have been covered while she was sexually assaulted, preventing her from seeing her assailants. This ignores

37

e.g., *People v. Bonillas* (1989) 48 Cal.3d 757, 792 [evidence of motive to kill existed where the victim "would easily have been able to recognize and identify defendant" as the perpetrator of the crime]; *People v. Shamblin* (2015) 236 Cal.App.4th 1, 13 [concluding the jury could have inferred from the evidence of a sexual assault at the murder scene that the defendant's motive to kill the victim was " ' "to avoid detection for the sexual and other physical abuses he had committed against her" ' "]; see also *Harper, supra,* 76 Cal.App.5th at pp. 461–462 [petitioner "should have known . . . the victim was likely to be killed" because the victim was familiar with the perpetrators and the perpetrators did not disguise themselves].)

In sum, the trial evidence overwhelmingly supports the conclusion Eddie knew Steve was an armed, explosively violent person who had previously committed violent offenses and who had talked about shooting someone earlier that very day. As the crimes unfolded, Eddie could observe additional warning signs of danger to the victims. Eddie could hardly have been any more "aware[ ] . . . of [the] particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of [Steve]." (*Banks, supra,* 61 Cal.4th at p. 803.) As a result, this factor weighs heavily against him.

The fourth *Banks* factor requires us to consider whether the defendant was "present at the scene of the killing, in a position to facilitate or prevent the actual murder, and [whether] his or her own actions or inaction play[ed] a

---

that Steve's semen was discovered in Delores's mouth; her face could not have been covered during the forced oral copulation. Also, Eddie testified he spoke to Delores, and she spoke back to him, as he was pretending to rape her, an indication nothing was hindering her ability to hear or speak at this point in the crimes. Thus, it is reasonable to infer Delores's face remained uncovered at least until the point when Eddie assaulted her.

particular role in the death." (*Banks*, *supra*, 61 Cal.4th at p. 803.) In *Banks*, our high court noted, "In cases where lethal force is not part of the agreed-upon plan, absence from the scene may significantly diminish culpability for death. [Citation.] Those not present have no opportunity to dissuade the actual killer, nor to aid the victims, and thus no opportunity to prevent the loss of life. Nor, conversely, are they in a position to take steps that directly and immediately lead to death, as with the Tisons' capturing and standing guard over the victims." (*Id.* at p. 803, fn. 5.) "As a corollary, there may be significantly greater culpability for accomplices who are present. In *Tison*, *supra*, 481 U.S. at page 158, [Ricky and Raymond Tison] were found to be major participants because each 'was actively involved in every element of the kidna[p]ping-robbery and was physically present during the entire sequence of criminal activity culminating in the murder' of the victims." (*Loza*, *supra*, 10 Cal.App.5th at pp. 50–51, citing *Banks*, at p. 803, fn. 5.)

Eddie argues that although he knew Steve was dangerous, there is no evidence he was actively involved in all stages of the crimes, or that he "willingly joined a plan to rob and to sexually assault anyone knowing the danger that Steve might pose." He contends the 1986 events were nothing other than "crimes of opportunity that arose when the group inadvertently stumbled upon the three victims in the park," that he happened upon the crimes when they were already in progress, and even then, his only role in them was participating in the sexual assault of Delores.

We disagree. Eddie's portrayal of the incident relies on his own self-serving testimony. Eddie acknowledges this but contends there was "no evidence [the incident] occurred any other way" and "no evidence Eddie participated in the events from the beginning or actively participated in the detentions, threats and theft." He further contends Michael "could identify

39

the conduct of only three of the perpetrators[.]" We reject Eddie's claims because he overlooks aspects of Michael's testimony that established the very facts Eddie claims went unproven. (See *People v. Williams* (2020) 57 Cal.App.5th 652, 664–665 [rejecting petitioner's "portrayal of the evidence in the light most favorable to himself as 'that showing is largely irrelevant to the issue on appeal [of] whether the evidence in [the People's] favor provides a sufficient basis for [the superior court's] findings' "].) As we explain, a factfinder could reasonably infer from Michael's testimony, as well as from other evidence in the record, that the crimes were pre-planned rather than spontaneous, and Eddie actively and willingly participated in them throughout.

Starting with Eddie's claim that he came upon the crimes when they were already in progress, Michael's testimony presented a very different version of events. Michael testified he "knew" at least four men "came up to" their car. He told an investigator the assailants "hit the front and the back door at the same time." They "dragg[ed] Star . . . and [Delores] out of the back of the car at the same time that somebody put a gun to [Michael's] head." The jury also heard that in an earlier proceeding, Michael testified that as the first assailant put the gun to his head, "[t]hree others" came around the other side of the car and "pulled Star and [Delores] out of the way[.]" Michael's description of the onset of the attack supports the conclusion all four members of Eddie's group, which would necessarily include Eddie, participated in the initial assault on the victims.

As for Eddie's claim that the crimes were spontaneous crimes of happenstance that occurred when the group stumbled on the victims, substantial evidence supports the conclusion the crimes were at least to some extent planned in advance. Michael's testimony established that in the

onrush of assailants, several things happened in quick succession. As we just discussed, he testified four men "came up to" their car and "hit the front and the back door *at the same time*." (Italics added.) The first assailant put the gun to his head as "[t]hree others" came around the other side of the car and "pulled Star and [Delores] out of the way[.]" Michael further testified that the first assailant pressed a gun to Michael's head and ordered him to crawl out of the car, *at the same time* that "people" dragged Star and Delores out of the back of the car, and an assailant who was not the first gunman opened the passenger-side front door to facilitate Michael's exit. That all four assailants overwhelmed and captured the victims in such an immediately coordinated fashion supports the inference they had agreed in advance to detain the victims for the purpose of committing armed crimes against them. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135 [evidence that when the surviving victim opened the door for an expected female guest (the defendant's accomplice), two male assailants immediately rushed in and started attacking the victims and coordinated their actions with one another, demonstrated "that the two male assailants agreed and coordinated with each other and with [the female accomplice] to forcibly gain access to the apartment for the purpose of robbing or stealing from the brothers"].) And although Michael was unable to say which assailant played which role, his testimony supports the further inference all four assailants, which again would necessarily include Eddie, took part in overwhelming and capturing the victims, at the very least by helping to "pull[ ]" Star and Delores out of the car so they could be detained. (See *Loza, supra*, 10 Cal.App.5th at p. 49 [holding that a petitioner whose main role in executing the armed robbery of a store involved holding the door open so the shooter could escape the store was a major participant in the felony].)

41

Nor was it physically impossible or inherently improbable for the foursome to have planned their assault and capture of the victims in advance. From Eddie's testimony that it took him a total of 17 minutes to run from the dirt lot back to E.C.'s car, one can infer it took a like amount of time for Steve, Eddie, and the two juveniles to walk from their car to the dirt lot, giving them the time and opportunity to agree to commit a robbery. The crimes occurred in a dark, secluded dirt lot; Michael testified he was playing the car radio, and Delores and Star were talking, before they were attacked; and Eddie testified that during his flight from the crime scene, he could still hear music playing. It is reasonable to infer the foursome did not embark on an innocent midnight hike down a brush-covered hill only to inadvertently stumble upon victims they spontaneously decided to rob, but that they instead heard the victims from a distance and purposely approached them with guns in order to commit armed crimes against them. It was also not inherently improbable the foursome's armed, itinerant quest for marijuana throughout Southern California would culminate in a decision to rob unsuspecting victims of proceeds that included marijuana.

Substantial evidence supports the further conclusion that after Eddie helped his cohorts overwhelm and capture the victims, he helped detain them. Eddie testified that after the male victims were ordered to the ground, he "stood by them" with his eyes open, facing them. A reasonable factfinder could accept Eddie's description of his actions and infer he was standing guard over the male victims while rejecting his claim that he acted with an innocent mental state. (See *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67–68 [" '[T]he jury properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus

42

weaving a cloth of truth out of selected available material.' "]; accord *People v. Fuiava* (2012) 53 Cal.4th 622, 715, fn. 34 (*Fuiava*); *People v. Ceja* (1994) 26 Cal.App.4th 78, 86 (*Ceja*), overruled on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 91; *People v. Rush* (1960) 180 Cal.App.2d 885, 886–887.)

Next, even though Eddie knew Delores was being gang raped at gunpoint, he joined in the sex crimes by sexually assaulting her. True, Eddie differed from his cohorts in that there was no forensic evidence he penetrated Delores. Other than that, however, his physical acts were largely indistinguishable from theirs. Eddie testified he was the third member of his group who "got on top" of Delores, and that everyone else in his group also "got on top of [her]." He lay on top of Delores's nude body with her breasts pressed against him, against her will, in a position that prevented her from escaping, and pretended to have sex with her.[16] These were acts of physical domination and subjugation; only the degree of sexual violation differed. Eddie, like his cohorts, also physically restrained Delores, making her available for the next member of the group to sexually assault her and contributing to the detention that ultimately resulted in her death.

And while Eddie testified he was a surprised, unwilling participant in the crimes who vocalized his surprise and opposition, a factfinder could

---

[16] The prosecution argued in the superior court that Eddie's conduct constituted a sexual battery. Section 243.4, subdivision (a), defines sexual battery to include "touch[ing] an intimate part of another person while that person is unlawfully restrained by the accused or an accomplice, . . . if the touching is against the will of the person touched and is for the purpose of sexual arousal, sexual gratification, or sexual abuse." Eddie does not dispute the prosecution's characterization of his conduct.

43

properly reject Eddie's testimony even if not contradicted.[17] (*Fuiava, supra,* 53 Cal.4th at p. 715, fn. 34; *Ceja, supra,* 26 Cal.App.4th at p. 86.) And yet his testimony *was* contradicted, by more than one witness.

For every expression of surprise, shock, or opposition Eddie claimed to have made during the course of the crimes, Michael testified he never heard any such statement. Michael also testified that even when the assailants' words were muffled, he detected no tone of surprise, shock, or argument. On appeal, Eddie contends Michael may not have been close enough to Eddie to hear everything he said. However, Eddie's own trial testimony refutes this contention. Eddie testified he stood near the male victims at all times except when he was sexually assaulting Delores, and he admitted there was nothing to prevent the male victims from hearing him when he was in this position.

The gas station manager's testimony describing Eddie's demeanor and actions at the gas station after Delores's murder that morning also tended to contradict Eddie's depiction of his mental state during the crimes. We first note a factfinder could reasonably infer that the four Hispanic males in the "reddish, maroon-ish" car who stopped at the gas station were Steve, Eddie, and the two juveniles, that the six-foot tall, calmer passenger was Eddie, and the shorter, more aggressive driver with the scratched up-face was Steve. Eddie's testimony established that the foursome rode in E.C.'s "red" or "maroon" Honda that day; that Eddie, standing at six feet, was five inches

_____

[17] Indeed, the jury's guilty verdict on the first degree felony murder count signaled that it disbelieved Eddie's claim he was an unwilling participant in the crimes who did not want to advance their commission and found instead that he facilitated the crimes with the intent to aid and abet their commission. And although Eddie claimed he joined in sexually assaulting Delores partly out of fear of Steve, and to "get [Steve] off [his] back," the jury also rejected his duress defense.

taller than Steve; and that Steve returned with his face scraped up after he fired the gunshot. And the subsequent discovery of Delores's purse and wallet at the gas station was circumstantial evidence that tended to confirm it was indeed Eddie, Steve, and the two juveniles who were seen by the manager.

Thus, when the group stopped at the gas station, Eddie had just witnessed the armed robbery and the gang rape of Delores at gunpoint, and he had, according to his testimony, been made to join in the sexual assault of Delores. And yet according to the manager's testimony, Eddie did not appear "distraught or upset in any way," nor did he seem angry with Steve. Eddie's demeanor, as described by the manager, could reasonably be viewed as inconsistent with the state of mind one would expect in someone who had just been forced to take part in armed crimes against his will.

One can also reasonably infer from the trial evidence that Delores's purse and wallet were discarded at the gas station during the assailants' 20- to 30-minute stop there; that the person who orchestrated the discarding was Steve, who (according to the former manager) appeared to be "on a mission"; and that Eddie and Steve's seemingly incongruous visit to the ladies' restroom was one step in this "mission." One can reasonably infer, in other words, that Eddie helped to dispose of Delores's purse and wallet at the gas station. (See *Harper*, *supra*, 76 Cal.App.5th at pp. 462–463 [evidence that after hearing but not seeing the gunshot, defendant carried stolen goods away from the crime scene weighed in favor of major participant finding].) The evidence that Eddie took part in all stages of the crimes calmly and actively, and then helped Steve dispose of evidence afterward with no sign of opposition, supports the conclusion he was a willing participant in the criminal venture. In sum, there is substantial evidence in the record to

45

support the conclusion that Eddie was an active, willing participant in the felonies who was "in a position to take steps that directly and immediately lead to death, as with the Tisons' capturing and standing guard over the victims." (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. 5.)

Just as Eddie's actions during the crimes contribute to our assessment of his culpability, so too do his inactions. (*Banks*, *supra*, 61 Cal.4th at p. 803.) Eddie emphasizes that the superior court found he ran away from the scene before the shooting and that this finding is binding upon us because it is supported by substantial evidence (i.e., his own trial testimony). He argues that since he was not at the crime scene when Steve fired the fatal gunshot, he could not have done anything to mitigate the possibility of violence. We disagree.

Even if Eddie was not at the exact location of the shooting at the precise moment it occurred, the trial evidence showed he was at the crime scene for the " 'entire sequence of criminal activity' " leading up to it. (See *Banks*, *supra*, 61 Cal.4th at p. 802.) The evidence further showed Eddie had the ability and opportunity to help reduce the foreseeable risk Steve would use lethal force against the victims, and yet Eddie did nothing.

Twice at the gas station, Eddie demonstrated his ability to intercede and allay Steve's increasing hostility when Steve was interacting with a third party. And yet despite being at the crime scene with Steve for approximately 23 minutes and in a position to recognize the serious risk Steve would harm one of the victims, he made no comparable effort to intercede with Steve on their behalf. Eddie also testified that he was "with" Delores for "a couple of minutes." He knew she was isolated and vulnerable. He knew she had just been raped—serially by two assailants—and that she was due to be raped again by the fourth member of his group. He had seen Steve point his gun

46

directly at her and he knew his brother was capable of sudden, explosive violence. And yet despite being in a position to help release her from her ordeal, he sexually assaulted her and then rejoined Steve. Substantial evidence supports the conclusion Eddie squandered an "opportunity to dissuade the actual killer" or "to aid the victims," either of which could have helped "to prevent the loss of life." (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. 5.)

Eddie contends there was nothing he could have done to prevent Delores's killing because the murder was cold and calculated, and he had no basis for anticipating Steve's use of lethal force.[18] We disagree. Eddie testified Steve was "upset" while brandishing his weapon during the crimes and that he knew, from past experience, that Steve's "upset" demeanor was a precursor to Steve "explod[ing]" in violence. " 'From the fact that [Steve] had a [ ]gun—as well as from [Eddie's] knowledge of [Steve's] violent tendencies—[Eddie] did not need great insight or experience to conclude that the victim would be killed.' " (See *Harper*, *supra*, 76 Cal.App.5th at p. 462.)

The final *Banks* factor calls for us to consider what Eddie did after lethal force was used. (*Banks*, *supra*, 61 Cal.4th at p. 803.) There is evidence in the trial record relevant to this factor that supports a finding of culpability. Eddie was on foot and just 50 yards away from the scene of the crimes when he heard the gunshot. He had every reason to suspect Steve had just shot one of the victims, and yet he did not turn back to see if any of them was wounded or in need of aid. (See *Harper*, *supra*, 76 Cal.App.5th at p. 462 [evidence the defendant was "close enough [to the murder scene] to hear the gunshot" but "did not go back inside to try and help the [victim]"

---

18    Eddie does not support his factual assertions with citations to the record; as a result, we could very well treat his contention as forfeited. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

weighed in favor of a finding of major participation].) And after hearing the gunshot, Eddie helped Steve dispose of evidence. (See *id.* at pp. 462–463 [evidence that after hearing but not seeing the gunshot, defendant carried stolen goods away from the crime scene weighed in favor of major participant finding].)

On the other hand, although Eddie had reason to doubt Steve's claim that he did not fire his gun at the victims, there was no evidence affirmatively establishing that Eddie learned before his 2007 arrest that Delores had been murdered.[19] As a consequence, Eddie's post-flight actions (helping dispose of the purse; failing to report the crimes) cannot be construed as efforts to cover up a murder. And as Eddie points out, even if they could, Enmund helped dispose of the murder weapons and never reported the crimes, and yet he was considered a minor actor. (See *Banks*, *supra*, 61 Cal.4th at p. 807.) On the whole, then, this factor weighs only slightly in favor of a finding of major participation.

Having thoroughly considered the evidence in the trial record, we conclude there is substantial evidence to support the superior court's finding that Eddie was a major participant in the underlying felonies. We cannot say no rational factfinder could make such a finding. It is evident that while Eddie may not have taken part in planning the crimes or supplying or using lethal weapons, he was keenly aware of the danger of taking part in armed crimes with Steve, actively participated in every stage of the robbery and sex

---

19    As we have noted, the superior court "assume[d]" Eddie learned about the murder "over the next hour or so, or over 20 years." We agree with Eddie this assumption was the product of impermissible speculation. (See Evid. Code, § 600, subd. (b) [inference must be based on facts "found or otherwise established in the action"].)

crimes despite this danger, and did nothing to mitigate the obvious and serious risk Steve would use lethal force against at least one of the victims. Under the totality of the circumstances, we conclude the trial court could properly find that Eddie's conduct placed him on the "major participant" end of the *Enmund-Tison* continuum.

III.

*Substantial Evidence in the Record Supports the Superior Court's Finding*
*That Eddie Acted with Reckless Indifference to Human Life*

Similarly, applying the factors set forth in *Clark, supra*, 63 Cal.4th 522, and considering the totality of the circumstances, we conclude there is substantial evidence in the record supporting the superior court's finding that Eddie acted with reckless indifference to human life. We note, in this regard, that there is significant overlap between the factors that demonstrate major participation in a felony and the factors that establish reckless indifference to human life. (*Id.* at p. 615 [observing that although the major participant and reckless indifference requirements are stated separately, " 'they often overlap' "].)

Starting with the first *Clark* factor, the defendant's knowledge of weapons, personal use of weapons and the number of weapons used (*Clark, supra*, 63 Cal.4th at p. 618), Eddie acknowledges on appeal that at least two guns were brought to and used at the scene of the crimes. Because Eddie was present at the scene and in close proximity to his cohorts, a factfinder could reasonably infer he was aware of both weapons. There is no affirmative evidence Eddie supplied the guns or was one of the individuals wielding a gun. But even if Eddie did not personally use a weapon, his statement to Steve during the armed gang rape—"You guys go on and do what you are going to do"—reflected reckless indifference to Delores's life. (*See Harper*,

49

*supra*, 76 Cal.App.5th at p. 464 [finding reckless indifference where defendant did not personally use a weapon but stated during the armed robbery, " ' "[w]*hatever you want to do* is fine with me . . . just as long as I'm not involved" ' "].)

As for the second *Clark* factor, the defendant's "[p]roximity to the murder and the events leading up to it" and the opportunity to either restrain the crime or aid the victim (*Clark, supra*, 63 Cal.4th at pp. 619–620), Eddie repeats many of the arguments he made when addressing the fourth *Banks* factor, which also considers the defendant's presence at the scene. He once again contends there was nothing he could have done to prevent the murder because he fled the scene before the shooting. We disagree that our focus must be so narrow.

In *Clark*, our high court explained: "Proximity to the murder and the events leading up to it may be particularly significant where, as in *Tison*, the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force." (*Clark, supra*, 63 Cal.4th at p. 619.) As we have already discussed, Eddie was physically present at the crime scene and had an opportunity to restrain his cohorts and aid the victims. Although Eddie was no longer present at the location where Delores was gang-raped when Steve shot Delores, Eddie had observed enough warning signs from Steve to alert him to the risk that Steve would use lethal force. Eddie's " 'fail[ure] to act as a restraining influence' " makes him " 'arguably more at fault for the resulting murder[ ].' " (See *ibid.*)

Eddie argues death threats are "common traits" of armed robbery and armed sexual assault, and Steve's death threats therefore gave him no reason to anticipate that Steve would kill. However, the test we are applying looks

50

at the totality of the circumstances as opposed to individual items of evidence in isolation.  (See *Scoggins*, *supra*, 9 Cal.5th at p. 677.)  Even if Steve's death threats alone did not signal that Steve would kill, a factfinder could reasonably conclude they were one of several warning signs from which a reasonable observer would discern a grave risk of danger to human life.

Eddie also argues his failure to stop and aid the victims when he heard the gunshot does not support a finding of reckless indifference.  He argues that since there was only one gunshot, he was necessarily aware there were two other victims left who could render aid.  He contends he is like the defendant in *Clark* who saw the murder victim's body and fled at the same moment that police were arriving at the scene.  (See *Clark*, *supra*, 63 Cal.4th at pp. 537, 614, 619–620.)  There, our high court explained it was difficult to infer the defendant's state of mind regarding the victim's death because "unlike in the Tisons' case, defendant would have known that help in the form of police intervention was arriving."  (*Id.* at p. 620.)  We are not persuaded that the scenario here was as ambiguous as in *Clark*.

In *Clark*, a first responder was already arriving at the scene when the defendant fled.  (*Clark*, *supra*, 63 Cal.4th at p. 620.)  It was difficult to infer indifference to life from the defendant's inaction because there was nothing more he could have done to summon aid.  But here, no official response was arriving as Eddie fled.  Moreover, Eddie inferably would have known the victims, from their physical state when he last observed them, were likely in no position to summon aid or immediately provide it.  Although the facts here are less egregious than the facts of *Tison*, in which the defendants abandoned the four shooting victims, three of whom were killed and one of whom was severely injured (*Tison*, *supra*, 481 U.S. at p. 141), neither are they as ambiguous as the facts of *Clark* in their display of reckless indifference.

51

The third *Clark* factor also weighs in favor of a finding of reckless indifference. "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark*, *supra*, 63 Cal.4th at p. 620.) Such was the case here. The victims were captured and held at gunpoint, the two male victims were bound, and the female victim was then isolated, restrained, and sexually assaulted at gunpoint, all in the presence of the four assailants. Michael estimated roughly 25 minutes elapsed between the time the gun was first pressed to his head and the time when he heard the gunshot. The prolonged nature of the crimes and close interaction between the assailants and victims make this case like *Tison*, in which the victims were captured and driven to a remote location where they were detained at gunpoint and finally killed (*Tison*, *supra*, 481 U.S. at pp. 139–141, 151), and unlike *Scoggins*, in which there was no capture or detention at all and the "entire interaction" between the perpetrators and victim lasted no more than five minutes (see *Scoggins*, *supra*, 9 Cal.5th at p. 681).

Eddie asserts Steve was "exclusively in charge" of the duration of the crimes. But the same could be said of Gary Tison, who directed the robbery and detention of the family of victims, and yet his sons Ricky and Raymond were found culpable for the resulting murder. (See *Tison*, *supra*, 481 U.S. at pp. 139–141, 151.)

Next, the fourth *Clark* factor, the defendant's knowledge of his cohort's "propensity for violence or likelihood of using lethal force" (*Scoggins*, *supra*, 9 Cal.5th at p. 677) weighs heavily against Eddie for the same reasons we discussed above when analyzing the evidence supporting the third and fourth *Banks* factors. Eddie's arguments here are duplicative of the arguments he

52

raised in opposition to an unfavorable finding on the third *Banks* factor. He again contends he had no reason to anticipate a killing since there was no evidence Steve had ever killed before and Steve did nothing to give Eddie advance warning he was contemplating shooting Delores; he disagrees with the prosecution's contention that Steve had a discernible motive to kill Delores based on her opportunity to see the perpetrators' faces and identify them to law enforcement later; and he argues no evidence indicates he willingly participated in the crimes despite knowledge of Steve's violent tendencies. Because we addressed all of these positions above when we analyzed the third and fourth *Banks* factors, we need not and do not address them again here.

The final *Clark* factor, the defendant's efforts to minimize the risks of violence during the felony, is a factor that mitigates culpability. (See *Clark*, *supra*, 63 Cal.4th at p. 622.) The parties do not identify, and we do not find, any evidence that satisfies this factor.

In sum, we conclude from the totality of the circumstances and the trial evidence relevant to the *Clark* factors that substantial evidence supports the superior court's finding that Eddie acted with reckless indifference to human life.

## DISPOSITION

The order denying the petition is affirmed.

DO, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.